## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

JAMES T.,

     Plaintiff,

v.                            CIVIL ACTION NO. 3:23-cv-00370

MARTIN J. O'MALLEY
Commissioner of Social Security,[1]

     Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff James T. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for a Period of Disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. This matter was referred to the undersigned United States Magistrate Judge by standing order on May 11, 2023, for consideration of the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Pending before this Court are Claimant's Brief in Support of Plaintiff's Motion for Judgment on the Pleadings (ECF No. 12), and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 15).

---

[1] Commissioner O'Malley was substituted in place of Acting Commissioner Kilolo Kijakazi following O'Malley's appointment on December 20, 2023, and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d). *See* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 12), **GRANT** the Commissioner's request to affirm his decision (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 50 years old at the time of his alleged disability onset date and 52 years old on the date of the decision by the Administrative Law Judge ("ALJ").[2] (Tr. 11). He has a high-school education, and has worked as an electronics technician, a warehouse supervisor, and a customer-service representative. (Tr. 21, 58-60, 333-39). Claimant alleges that he became disabled on January 28, 2020,[3] due to anxiety and depression, chronic pain in his back and legs, obesity, and hypertrophic cardiomyopathy, syncope,[4] and other heart problems. (Tr. 263).

Claimant protectively filed his application for benefits on March 23, 2020.[5] His claim was initially denied on January 4, 2021, and again upon reconsideration on March 14, 2022. (Tr. 128-38, 147-50.) Thereafter, Claimant filed a written request for hearing, which was received on April 1, 2022. (Tr. 151-53, 172-91). An administrative hearing was

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 8.

[3] Claimant initially gave his disability onset date as January 26, 2019. (Tr. 252-53). However, he later amended the date to January 28, 2020. (*See id; see also* ECF No. 15 at 3 n.1; Tr. 11, 300).

[4] Syncope is the medical term signifying a loss of consciousness, colloquially known as fainting or passing out. Syncope, *Stedmans Medical Dictionary* 875540 (Westlaw 2014).

[5] Claimant previously filed an application for disability insurance benefits ("DIB") on February 22, 2017, which was denied in an ALJ decision on January 25, 2019 (Tr. 65-78). In the subsequent DIB application that is presently before the Court in this matter, Claimant's alleged onset date of January 28, 2020, is three days after his prior unfavorable decision. (Tr. 252-53).

held by telephone before an ALJ on December 12, 2022. (Tr. 43). Claimant was represented by counsel at the hearing and offered testimony, along with a vocational expert. (Tr. 39-61). On January 9, 2023, the ALJ entered an unfavorable decision. (Tr. 11-22). Claimant then sought review of the ALJ's decision by the Appeals Council; however, the Appeals Council denied Claimant's request for review on March 7, 2023, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 1-6.)

Claimant timely brought the present action on May 5, 2023, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed the transcript of the administrative proceedings (ECF No. 8). Claimant subsequently filed his Brief in Support of Motion for Judgment on the Pleadings (ECF No. 12), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 15). Claimant then filed her Response to Brief in Support of Defendant's Decision. (ECF No. 14.) As such, this matter is fully briefed and ready for resolution.

## B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes the relevant portions here for the convenience of the United States District Judge.

### 1. Medical Treatment

On December 2, 2019, Claimant presented to the Charleston Area Medical Center Teays Valley Hospital ("CAMC") for a Duplex Doppler carotid artery ultrasound and a computerized tomography ("CT") head scan; the imaging was ordered by neurologist Robert Lee Lewis II, M.D., based upon Claimant's complaints of syncopal episodes, seizures, dizziness, and history of hypertension. (Tr. 691-92). Matthew W. Morris, M.D., interpreted the CT scan. (Tr. 691). Dr. Morris noted intracranial vascular calcifications,

but he found that Claimant's cerebrum and cerebellum were unremarkable; there was no evidence of acute cortically based infarct, intracranial hemorrhage, mass lesion, midline shift, abnormal extra-axial fluid collection, or hydrocephalus; and the calvarium was intact. *Id.* Further, Dr. Morris found that the remainder of the examination was "unremarkable." *Id.* Based upon these findings, Dr. Morris's impression was "no acute intracranial abnormality." *Id.* John J. Anton, M.D., interpreted the ultrasound. He found "[t]here is hard plaque present at the right carotid bulb with 30% narrowing," but there was "no evidence for elevated velocities to suggest a hemodynamic significant stenotic lesion." (Tr. 692). Dr. Anton's impression was "[r]ight carotid bulb atherosclerotic change," with "[n]o evidence for hemodynamic significant internal carotid artery stenosis." *Id.* Following these imaging results, Claimant was scheduled for further testing by electroencephalogram ("EEG") and a sleep evaluation (Tr. 713).

On December 13, 2019, Claimant presented to his primary-care physician, Dr. Christina Webb at the West Virginia Family Health Care Center, for a follow-up appointment regarding his conditions of muscle pain, obesity, and syncope. (Tr. 843). The discussion notes state that Dr. Webb "discussed with patient today that he cannot drive at this time" due to "concern for further questionable seizure episodes and/or syncope." *Id.*

A subsequent neurology consult note by Dr. Lewis indicates that Claimant presented for the EEG test on January 23, 2020, on referral from Claimant's primary-care physician, Dr. Webb. (Tr. 747). The neurology report stated that "[t]here is an abundance of beta frequency activity seen diffusely," and "[s]leep architecture was not observed." (Tr. 748). Additionally, "[h]yperventilation and photic stimulation produced no additional findings . . . [and] [h]eart rate monitoring was regular at about 72 beats per

minute." *Id.* Dr. Lewis's interpretation was that "[t]his EEG is normal during wakefulness." *Id.* Further, Dr. Lewis noted that "[b]eta frequency activity is a nonspecific finding, frequently associated with sedative medication," and that "[t]he lack of epileptiform discharges does not exclude the diagnoses of epilepsy in the appropriate clinical setting." *Id.* Finally, Dr. Lewis noted that, "IF further concern remains, a repeat study with sleep deprivation is suggested." *Id.* (emphasis in original).

On January 30, 2020, Claimant was seen by Mohammad Aljasmi, M.D., an internal-medicine physician specializing in Pulmonary, Critical Care, and Sleep Medicine, "for management of his obstructive sleep apnea." (Tr. 744). Claimant reported that he was diagnosed with obstructive sleep apnea "many years ago" and "has been on CPAP since." *Id.* Further, Claimant reported that over the past year he has been coughing and experiencing "worsening excessive daytime sleepiness falling asleep easily during conversation sometimes during driving and when playing board games with family." *Id.* Finally, Claimant reported that he has "no problems" going to sleep or maintaining sleep; he sleeps approximately ten hours every night, and that "[h]e wakes up tired and refreshed." *Id.* On examination, Dr. Aljasmi assessed obstructive sleep apnea, and noted Claimant was a current smoker. (Tr. 746). Dr. Aljasmi's treatment plan was to order a new CPAP machine and follow up with Claimant in three months; further, Dr. Aljasmi recommended weight loss and "[s]tressed [the] importance of using a CPAP machine at all times." *Id.*

On March 2, 2020, Claimant followed up with Dr. Webb. (Tr. 835). There, he reported that Dr. Lewis "started him on" seizure medication, but that "he has had more episodes" of blacking out without any warning signs beforehand. (Tr. 836). Treatment notes state that Claimant's motor strength and tone were abnormal on examination, with

"decreased strength" in the left upper and lower extremities; however, Claimant's cranial nerves were found to be grossly intact. (Tr. 836-37). Claimant also reflected some tightness in his neck and decreased sensation in his right middle finger and ball of his right foot. *Id.* Dr. Webb assessed Claimant with an ingrown toenail, obesity, cervicalgia (neck pain), degeneration of an intervertebral disc from an unspecified thoracic, thoracolumbar and lumbosacral intervertebral disc disorder; cervical and lumber radiculopathy, an unspecified Vitamin D deficiency, unspecified hyperlipidemia, and hypertension. (Tr. 837). Dr. Webb's treatment plan involved rehabilitation exercises for Claimant's neck pain, instructions for "learning about healthy weight," an order for Claimant to return to the office for "fasting labs," and finally, a referral to podiatry for an ingrown toenail. Aside from recommending exercises for Claimant's neck pain, Dr. Webb's treatment plan did not recommend any action to address the musculoskeletal issues. (Tr. 837). Claimant was scheduled to follow up in three months. *Id.*

On March 15, 2020, Claimant returned to Dr. Aljasmi for a sleep study. (Tr. 947). Dr. Aljasmi reviewed the raw data from the study and found that Claimant had an overall sleep efficiency of about 85%. *Id.* Dr. Aljasmi noted that Claimant was started on a CPAP machine during the course of the night. (Tr. 943-45). When the CPAP was titrated up to 14 cm of water pressure, the number of apneas and hypopneas was reduced "down to zero events at that level," indicating that Claimant's sleep-apnea symptoms were resolved when he used a properly-calibrated CPAP machine. *Id.*

Subsequently on May 4, 2020, Claimant returned for a follow-up appointment with Dr. Aljasmi and reported no new changes as "he has yet to receive his new CPAP." (Tr. 943). Dr. Aljasmi performed a physical examination and noted that Claimant had an intact range-of-motion in his neck and shoulder; showed no deformities in his hands or

feet; had no kyphosis; had no edema in his lower extremities; and displayed a normal mood and affect. (Tr. 945). Dr. Aljasmi's treatment plan consisted of encouraging Claimant to lose weight, following up on Claimant's new CPAP order, and scheduling Claimant to return in three months with his CPAP device. *Id.*

On June 2, 2020, Claimant presented to Dr. Webb for a follow-up visit. (Tr. 964-67). The treatment note states that Claimant gave his verbal consent "to treat through telehealth with audio" for the appointment due to the Covid-19 pandemic, though he was "unable to do video due to driving." (Tr. 966). Claimant was noted to be in a "parked car" during the telehealth appointment. *Id.* He further reported that, normally, he relied on his daughter to drive him around. *Id.* The treatment note states that Claimant's chief complaint was "wanting [his] pain meds changed," and he reported that "ibuprofen is no longer cutting it" due to pain in his back and leg. (Tr. 964). Claimant reported that he was waiting on his insurance company to approve the new CPAP machine prescribed by Dr. Aljasmi. (Tr. 966). Further, Claimant reported that his last syncopal episode occurred approximately one month before, when he "woke up and lost a few minutes." *Id.* He further stated that sometimes he feels fatigued before a syncope episode. *Id.* Dr. Webb assessed Claimant with unspecified cardiac arrhythmia and lumbar radiculopathy. (Tr. 967). Her treatment plan involved stopping ibuprofen and starting arthrotec in its place for pain; prescribing diclofenac for his radiculopathy, and referring Claimant to cardiology as soon as possible for his intermittent syncopal episodes. *Id.*

On referral to cardiology, Claimant was prescribed a "Holter" heart monitor to help Claimant's treatment team discover the etiology, or cause, of the syncope episodes. (Tr. 1044). Additionally, a June 17, 2020 Persantine Stress Test showed evidence of moderate ischemia in the basal inferior, mid inferior and apical region(s). (TR 1053). Later in June

2020, Claimant had another episode of syncope, triggering his monitor and resulting in him being brought in for a cardiac examination. (Tr. 1044). On June 29, 2020, Claimant underwent a left heart catheterization, selective coronary angiography, and left ventriculography performed by Mohammed Y. Haffar, M.D. (Tr. 1070). The procedure "revealed significant three-vessel coronary artery disease." *Id.* Because Dr. Haffar found that Claimant "was not a suitable candidate for percutaneous intervention," he referred Claimant for an urgent coronary-artery-bypass consult with Dr. Ramanathan Simpath from the Cardiology and Neurology Service at Charleston Area Medical Center Memorial Hospital ("CAMC Hospital"). (Tr. 1070).

The following day on June 30, 2020, Claimant was admitted to the CAMC Hospital for Dr. Simpath's consult. (TR 1060-1062). Treatment notes from the consult reviewed the Claimant's medical history in detail. First, Dr. Simpath observed that Claimant "was known to have bicuspid aortic valve" and reported episodes of syncope. *Id.* Dr. Simpath explained the valve "was considered to be stenotic only to a very mild degree and so [Claimant] had a work up which included Holter monitoring, [a] complete neurological work up which included [an] EEG, CT scan, carotid studies and tilt test and all of them came back negative." *Id.* Additionally, "review of the Holter monitor did not show any significant arrhythmia so the patient underwent a stress test again," which was positive. (Tr. 1070-71). Dr. Simpath explained that, based upon the positive stress test results, Claimant underwent the cardiac catheterization which revealed "significant three-vessel coronary artery disease." (Tr. 1071). Dr. Simpath further noted that Claimant "stopped smoking only just a few weeks ago." *Id.* On examination, Dr. Simpath found that Claimant's "femorals" were "not palpable well" and his "[v]ein also is not seen well in the ankle," both because of obesity. *Id.* Additionally, he found that Claimant's motor power

of the extremities was good. Dr. Simpath planned to move forward with surgery once he received the results of the echocardiogram. (Tr. 1071-72). Results of the July 2, 2020, Transesophageal Echocardiography showed mild stenosis and mild regurgitation in Claimant's aortic valve. (TR 1103). Accordingly, Claimant underwent a successful quintuple coronary artery bypass operation on July 6, 2020. (Tr. 1066-69, 1073-75).

On July 15, 2020, following his hospital discharge, Claimant presented for a follow-up appointment with Dr. Webb via telehealth. (Tr. 1079-82). Referencing Claimant's cardiology treatment notes, Dr. Webb stated that "they want him up and moving 30 min[utes] a day . . . [and] will start cardiac therapy in 4-6 weeks." (Tr. 1082). Claimant reported to Dr. Webb that he was "feeling pretty good except his back." *Id.* Dr. Webb could not perform a physical examination due to the covid-19 pandemic, but she did perform a mental-status examination via telehealth and noted that Claimant's cognition was appropriately oriented, he had a stable, euthymic mood, a pleasant and happy mood congruent to his unremarkable thought content, and had intact insight, judgment, and thought processes. *Id.* Dr. Webb's treatment plan involved conferring with cardiology regarding changes to Claimant's prescription medication, and prescribing hydrocodone for radiculopathy and pain in the lumbar region. *Id.*

Following discharge, Claimant reported that he did "remarkably well" following heart surgery. (Tr. 1086). At a September 3, 2020 follow-up appointment, Claimant denied experiencing any chest pain or exertional angina, and his heart and lungs were found to be normal on physical examination. (Tr. 1167). Claimant was referred out for cardiac rehabilitation. *Id.*

In December 2020, Claimant had a consultative examination performed. (Tr. 1181). An x-ray reflected only mild issues in his lumbar spine, consisting of mild-

degenerative-endplate changes and mild-multilevel-facet arthropathy. (Tr. 1179). He ambulated without an assistive device, transferred from the chair to the exam table without difficulty, and had a steady gait with a limp on the right. (Tr. 1182). He was comfortable in the sitting position and had no issues with his neck, chest, or cardiovascular system. (Tr. 1183). He had 4/5 strength in his left upper extremity and 5/5 strength in all other muscle groups (Tr. 1183-84). He was able to tandem gait, tip toe walk, and heel walk, and he had reduced range of motion throughout his extremities. (Tr. 1184). The examiner noted that Claimant "displayed poor effort." (Tr. 1184).

On March 19, 2021, Claimant returned to Dr. Webb for follow-up. He reported that he had presented to the Emergency Room at St. Mary's Medical Center (the "ER") on March 10, 2021, after experiencing some shortness of breath and swelling in his right leg. (Tr. 1200-1218, 1882). Claimant was admitted to the ER, where ultrasound examination of his right leg ruled out deep-vein thrombosis. (Tr. 1200-1218). Claimant was assessed with exertional dyspnea, peripheral edema, history of coronary artery disease, hypertension, dyslipidemia, obesity, obstructive sleep apnea, hypertrophic cardiomyopathy with possible obstruction, and left ventricular aneurysm. *Id.* Ultimately, an automatic implantable cardioverter defibrillator was implanted, and treatment notes show Claimant was "doing well" at discharge on March 17, 2021. (Tr. 1200-01; 1882).

Also during his March 19 follow-up with Dr. Webb, Claimant further reported that he experienced one syncope episode prior to the pacemaker implantation, but had not experienced any since. *Id.* Additionally, Claimant reported that his insurance company would not cover the new CPAP prescribed by Dr. Aljasmi on January 30, 2020, and that he needed to reschedule an appointment with Dr. Aljasmi to bring his old CPAP in for recalibration. *Id.* On physical examination, Dr. Webb noted that Claimant was morbidly

obese with limited ambulation. *Id.* She found that there were decreased carotid sounds in Claimant's neck vessels, and she was unable to palpate for pulses. *Id.* Additionally, Dr. Webb found edema and erythematous changes in the right lower extremity. *Id.* However, Dr. Webb's examination revealed no issues with respect to Claimant's head, neck, eyes, lungs, skin, and abdomen. *Id.* Dr. Webb found no cyanosis or other musculoskeletal issues in Claimant's extremities, and results of a neurologic examination showed grossly intact sensation and cranial nerves, with no tremor. *Id.* Further, Claimant had normal results on psychological examination. *Id.* Dr. Webb's assessment was hypertrophic cardiomyopathy, severe obesity, syncope, and symptoms and signs of circulatory issues. (Tr. 1882-83). Dr. Webb's treatment plan involved counseling Claimant on his obesity and learning about a healthy weight, referring Claimant to Dr. Haffar for his symptoms of syncope, and to return in approximately one month for follow-up. (Tr. 1882-83).

On April 13, 2021, Claimant was seen by Nurse Practitioner Marsha L. Sutton, APRN-CNP, at the Vascular Office Clinic. (Tr. 1605-16). Claimant reported continuing episodes of syncope. (Tr. 1189). He was assessed with chronic peripheral venous insufficiency, lymphedema, carotid stenosis, hypertension, and hyperlipidemia. (TR 1514-1516). The treatment plan involved prescribing medication, instructing Claimant to wear compression stockings and elevate his legs when sitting, and scheduling a follow-up appointment. (Tr. 1516, 1532). Later that same month, a Doppler study was performed, reflecting atherosclerosis but no definite evidence for a hemodynamically-significant disease. (Tr. 1515-16).

Claimant returned to the Vascular Office Clinic on May 19, 2021. Treatment notes reflect that Claimant had been wearing wraps on both his legs. (Tr. 1605-09). He reported that since his surgery and implantation with the defibrillator, he had only experienced

syncope on two occasions; however, Claimant also reported that he continued to experience lightheadedness. *Id.* He was assessed with dyspnea on exertion and a vitamin d deficiency, and referred to a lymphedema specialist. *Id.*

At a follow-up appointment with the Vascular Office Clinic in July 2021, Claimant had another cardiac catheterization, which reflected severe multilevel coronary artery disease. (Tr. 1535). However, no additional intervention procedures were recommended, and he was directed to continue his current medical management and risk-factor modification. (Tr. 1601). Further, treatment notes indicate that CT imaging of Claimant's chest dated July 6, 2021 revealed a 1.5cm focal left ventricular tip, assessed as a likely myocardial lesion. (TR 1624-1625).

At a subsequent follow-up appointment in August 2021, an echocardiogram and pacemaker evaluation were ordered. (Tr. 1682-84). Claimant was scheduled to follow up with cardiology in two months to discuss the results, with no triggering events identified with his pacemaker and few findings following his echocardiogram. (Tr. 1679-80).

On August 25, 2021, Claimant presented to his primary-care physician, Dr. Webb. (Tr. 1598-1601). Dr. Webb's treatment notes reflect that Claimant was no longer following with Dr. Haffar; however, he was seen at Cleveland Clinic "by [a] heart failure doctor," who then referred Claimant "to EP there" for a device check, echocardiogram, and electrocardiogram scheduled for October 29, 2021. (Tr. 1601).

Additionally, during his August 25, 2021 appointment, Claimant reported to Dr. Webb that he was prescribed socks for his edema, and he felt that "they help." *Id.* He reported experiencing an elevated heart rate when walking from one room to another, but he was no longer smoking. *Id.* Although he "was due for a new cpap machine two years ago," Claimant reported that he was still using his old machine and that he was having

trouble scheduling a follow-up appointment with his pulmonologist. *Id.* Claimant further reported sleeping for up to twelve hours but not obtaining restful sleep, causing him to be "ready for a nap" within just a few hours of waking up. *Id.* Finally, Claimant reported an uneven heart rate, as well as continued episodes of syncope, and rapidly-changing heart rates. *Id.* On examination, Dr. Webb found decreased breath sounds and diminished air movement as well as edema. (Tr. 1602). She assessed Claimant with coronary arteriosclerosis, severe obesity, hypertrophic cardiomyopathy, degeneration of intervertebral discs, Vitamin D deficiency, tobacco dependence syndrome, obstructive sleep apnea syndrome, and intermittent heart palpitations. *Id.* For a treatment plan, Dr. Webb ordered a sleep study, testing with a Holter monitor, lung cancer screening, prescription of medication for Claimant's back pain and hypertrophic cardiomyopathy, and weight-loss education. *Id.*

On October 29, 2021, presented to Cleveland Clinic for evaluation of possible arrhythmic cause for his chief complaint of fatigue and recurrent syncope. (Tr. 1677-80). On examination, it was noted that "patient walks with a cane and is sedentary." (Tr. 1679). Further, examination indicated "palpitations, CAD," mild concentric left ventricular hypertrophy, left ventricular diastolic dysfunction—Grade I, small apical aneurym of the left ventrical without thrombus, mildly decreased systolic function, and aortic sclerosis with "[n]o significant LVOT or LV cavity gradient." (Tr. 1679). Review of the pacemaker data showed an "ongoing pattern of heart varying from 60 to 120 bpm," however, the device showed to be functioning normally with no arrhythmias to explain the syncopal episodes. (Tr. 1680). It was concluded that "there is no evidence to suggest arrhythmia is causing the events," however, Claimant was noted to have "significant venous stasis and probable autonomic dysfunction as primary causes for syncope." *Id.* A recommended

treatment plan stated that additional testing could be considered with formal evaluation in the syncope clinic, and that Claimant "will plan to follow-up with ICD remote checks locally and is also scheduled to see Dr. James in follow-up here at Cleveland clinic." *Id.*

On November 17, 2021, Claimant had another follow-up appointment with his primary-care physician, Dr. Webb. (Tr. 1649). Claimant reported he was seen at Cleveland Clinic, where he was told that he had been misdiagnosed and the pacemaker was unnecessary; however, they did adjust Claimant's pacemaker, and he reported that the episodes he was experiencing were not as severe. (Tr. 1652). He reported that he still experienced syncopal symptoms every two weeks. *Id.* Dr. Webb's treatment plan involved instructing Claimant to wear compression stockings, prescribing vitamin supplements, ordering blood tests, ordering a colon-cancer screening, ordering an electrocardiogram, and referring Claimant to a neurologist. (Tr. 1653).

On November 29, 2021, Claimant appeared via telehealth for a follow-up with Dr. James Cleveland Clinic for his chief complaints of continued syncope and sensation of increased heart rate. (Tr. 1903-1904). Dr. James merely concurred with the prior referral to the facility's Syncope Clinic. (Tr. 1904).

Finally, Claimant had another physical consultative examination in February 2022, just after the expiration of his date last insured on December 31, 2021. (Tr. 1832). He ambulated with a cane but transferred from the chair to the exam table without it. (Tr. 1834). His cardiovascular system was unremarkable, he had 4/5 strength in the left upper extremities and 5/5 strength in all other muscle groups. (Tr. 1835). He could tandem, toe, and heel walk. (Tr. 1835). Claimant also displayed reduced range of motion, but he was again noted to have "displayed poor effort." (Tr. 1835).

### 2. *Mental Health Treatment*

Claimant's treatment for mental-health impairments over the relevant period was limited solely to medication, with no evidence of any counseling or hospitalizations due to mental-health concerns. In December 2019, Claimant had a negative depression screening and had normal memory, attention, knowledge, language, and speech. (Tr. 712-13). At his sleep apnea appointment in January 2020, Claimant displayed a normal mood and affect. (Tr. 746). Similarly, in May 2020 Claimant displayed no psychiatric symptoms, had normal cognition, and normal mood and affect. (Tr. 945). His mental status was also normal at a telehealth appointment in June 2020. (Tr. 966). He had a psychological assessment performed in November 2020, where he reported some symptoms of anxiety and depression and had some issues with mood and affect, but he was properly oriented with logical thought process, normal thought content, no issues with perception, fair insight, normal judgment, normal memory, and normal concentration. (Tr. 1173-74). Additionally, an intelligence test was performed, with Claimant having a Full Scale IQ of 112. (Tr. 1175).

In April 2021 another depression screening was performed, which once again was negative, and Claimant again had normal mood and affect. (Tr. 183). He had another psychological consultative examination in January 2022, following the expiration of his date last insured, where he again displayed some symptoms of anxiety and depression but had normal appearance, attitude, speech, orientation, thought process, thought content, perception, judgment, insight, memory, concentration, and persistence, albeit a "somewhat slow" pace. (Tr. 1824-25).

### 3. *Prior Administrative Findings and Opinion Evidence*

State-agency medical consultants Isidro Amigo, M.D., and Amy Wirts, M.D., reviewed the record evidence and found that Claimant could lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk for six hours, and sit for six hours in an eight-hour workday. (Tr. 107-08, 122). Additionally, Dr. Amigo found that Claimant could never climb ladders, ropes, or scaffolds, and could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 108- 09, 122-23). Drs. Amigo and Wirts further found Claimant had limited pushing, pulling, and overhead reaching with his upper-left extremity, and should avoid concentrated exposure to extreme cold, extreme heat, vibration, and pulmonary irritants, as well as all exposure to hazards. (Tr. 109-10, 123). Dr. Wirts also found that Claimant could occasionally handle with his upper-left extremity. (Tr. 123).

State-agency psychological consultants John Todd, Ph.D., and Jeff Boggess, Ph.D., found that Claimant had no severe mental impairments (Tr. 104-05, 120-21).

Christina Webb, M.D., Claimant's primary-care physician, opined that Claimant could lift and carry up to ten pounds frequently, could stand and walk for less than two hours, sit for approximately three hours, and had to alternate positions two to three times per day. (Tr. 941). She further opined that Claimant had limited ability to push and pull, could never crouch, crawl, or climb ladders, ropes, or scaffolds, and could occasionally climb ramps and stairs, as well as balance, stoop, and kneel. (Tr. 941). Finally, Dr. Webb opined that Claimant had limited ability to reach, handle, finger, and feel, and should avoid all exposure to extreme cold, extreme heat, wetness, humidity, pulmonary irritants, and hazards. (Tr. 941).

### C. Claimant's Testimony

At the hearing before the ALJ held on December 12, 2022, Claimant testified that he was unable to work due to pain in his back, extremities, wrists, and hands, along with carpal tunnel syndrome. (Tr. 45-46).  Claimant reported pain in upper and lower back made worse by activity such as standing in one position for too long. He estimated that he could stand for up to fifteen minutes, sit for approximately twenty minutes before needing to adjust position, had to lay down throughout the day, and could lift objects weighing "about a gallon of milk" or less. (Tr. 50-51, 56). Claimant reported problems with swelling in his legs, and testified that he must elevate his legs when sitting. Further, Claimant testified that he experiences some relief with medication, uses a cane to ambulate, and has treated with medications, injections, physical therapy, and surgery. (Tr. 46-50).  He also testified that he has issues with his heart, resulting in the insertion of a pacemaker; additionally, Claimant testified that he "passes out" periodically. (Tr. 48-49).

As for his mental-health impairments, Claimant testified that he suffers from depression and cannot concentrate. (Tr. 47-48).  His symptoms improved with medication, but one of his psychiatric medications causes him to feel numb and emotionless. *See id.* He testified that he struggles with personal care, does few chores around the house, and has issues performing activities like cooking and going shopping (Tr. 52-53).

Claimant also submitted three function reports.  First, in August 2020, Claimant reported some issues with personal care, but also reported making simple meals daily, and being able to handle money except for paying bills. (Tr. 326-29). He performed daily activities including folding laundry, sweeping floors, loading the dishwasher, cleaning counters and tables, and making his bed. (Tr. 326-29).  His hobbies included

reading, watching television, and writing. (Tr. 326-29). Next, in October 2020, Claimant reported a decrease in functioning, but still reported that he was able to engage in a number of daily activities including making meals daily, folding laundry, and occasionally washing dishes. (Tr. 346-48). Finally, in October 2021, Claimant alleged difficulty with personal care, making meals, doing chores, handling money, and performing hobbies like reading and watching television. (Tr. 367-69).

### D. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step. At the second step, the ALJ considers the combined severity

of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC

in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659. After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If he does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether he can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If he cannot perform other work, the ALJ will find him "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ found Claimant satisfied the insured status requirements through December 31, 2021, and did not engage in substantial gainful activity during the relevant time period. *Id.* Further, the ALJ found that the following conditions constituted "severe" impairments, as defined by 20 CFR 404.1520(c): degenerative disc disease of the cervical, lumbar and thoracic spine, coronary artery disease, chronic obstructive pulmonary disease, obstructive sleep apnea, and obesity. *Id.* However, she found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16). Upon assessing Claimant's RFC, the ALJ determined as follows:

> Through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can occasionally push and pull with the left upper extremity; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. He can occasionally reach and handle with the left upper extremity. He must avoid more than occasional exposure to temperature extremes, vibration, fumes, odors, dust, gases, and poor ventilation; and can never work at unprotected heights or around dangerous moving machinery. He must be able to use a cane when standing and walking.

(Tr. 17). The ALJ then concluded that, through the date last insured, Claimant was capable of performing past relevant work as a customer service representative, which was sedentary level, SVP-3 work, 299.357-014. (Tr. 21). The ALJ explained that this past relevant work did not require the performance of work-related activities precluded by the claimant's residual functional capacity.

In support of her conclusion, the ALJ pointed to Claimant's testimony that his past work as a customer service representative was performed over the telephone in a seated position and required him to lift no more than five to 10 pounds. *Id.* Because the Dictionary of Occupational Titles ("DOT") does not address the use of a cane, the ALJ enlisted a vocational expert ("VE"), who relied upon his years of experience to aid in the ALJ's finding that Claimant could perform his past work as actually and generally performed under the RFC. *Id.* As a result, the ALJ concluded that Claimant was not under a disability during the relevant time period. *Id.*

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434

F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    ANALYSIS

Claimant's arguments are twofold. First, he argues that the ALJ erred by failing to fully develop the medical evidence of record with respect to Claimant's severe impairments, and second, that the ALJ erred by failing to consider Claimant's impairments in combination.  (ECF No. 12 at 12–17).  Claimant asks this Court to find him disabled and award him benefits or to remand this matter to the ALJ for further consideration.  (*Id.* at 16).  The Commissioner responds that the ALJ's determination is supported by substantial evidence and that Claimant has not properly developed his arguments, resulting in waiver under well-established precedent.  (ECF No. 17 at 8–13).

### A. Development of the Record

Claimant first argues that the ALJ erred by failing "to fully develop and give full analysis and consideration of all medical and mental evidence regarding Claimant's

medical and mental impairments." (ECF No. 12 at 13). In support of his broad statement, Claimant simply lists a number of conditions,[6] and repeats his vague assertion "that the ALJ failed to develop medical evidence for [them]." *Id.* Lastly, without providing any analysis or discussion, Claimant concludes by simply listing several portions of his own testimony from the record, including statements regarding his ability to work and drive; his conditions, symptoms, and reports of pain; daily activities; past job duties; medication regimen and previous surgeries; use of a cane, his ability to sit, stand, lift, and walk; and finally, that "the weather has an effect on his back pain." (ECF No. 12 at 13-16 (citing Tr. 17, 43-56)). Following this last statement regarding the weather, Claimant's brief abruptly turns to the next alleged error, discussed *infra*, without addressing the connection between the conditions and testimony listed by Claimant to his conclusory statement that the ALJ failed to fully develop and give full analysis and consideration to all the evidence.

On review, the undersigned **FINDS** that Claimant failed to demonstrate error on this basis. "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Perry v. Astrue*, No. 3:10-cv-01248, 2011 WL 5006505, at *16 (S.D.W. Va. Oct. 20, 2011) (quoting *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001)). Simply put, Claimant has not shown that there is ambiguous evidence, or that the record

---

[6] Specifically, Claimant asserted as follows:

> The multiple medical conditions and severe mental conditions that the ALJ failed to develop medical evidence for includes: degenerative disc disease of the cervical, lumbar and thoracic spine, degenerative joint disease, coronary artery disease, chronic obstructive pulmonary disease, obstructive sleep apnea, obesity, cervical fusion with radiculopathy, major depressive disorder, anxiety, umbilical hernia, bilateral carpal tunnel syndrome, high blood pressure, high cholesterol, heart problems, coronary bypass x 5, defibrillator for heart, seizures, attention deficit disorder and obesity.

(ECF No. 12 at 13).

was inadequate to allow for proper evaluation of the evidence. Nothing in Claimant's brief provides any description, analysis, or explanation how his quoted testimony and list of impairments relates to the ALJ's analysis or any deficiencies therein. While Claimant asserts that the ALJ failed to properly develop the record in this case, ironically, *Claimant has fundamentally failed to demonstrate*—or even address *why*—further development by the ALJ was purportedly necessary. *See id.* Particularly, Claimant has not addressed what additional development was needed in this case, the basis for asserting further development was necessary, or the basis for his assertion that the ALJ's failure to do so constituted error.  (*See* ECF No. 16 at 13–14.)

As the Fourth Circuit explained, "[a] party waives an argument by failing to develop its argument—even if its brief takes a passing shot at the issue." *Haperin v. Saul*, 855 F. App'x 114, 121 n.8 (4th Cir. 2021) (internal citations omitted). *See also Duckworth v. Berryhill*, 5:15-cv-00129, 2017 WL 1528757, at *5 (W.D.N.C. Apr. 26, 2017) ("It is well-established that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" (citations omitted)); *Heather M. v. Berryhill*, 384 F. Supp. 3d 928, 934 (N.D. Ill. June 5, 2019) (stating that "Judges are not required to sift through the record without direction from counsel—especially a thousand-page record—and find evidentiary support for contentions tossed out like salt strewn on an icy sidewalk").

This Court rejected a claimant's undeveloped argument in a strikingly similar matter, holding that courts should not be tasked with researching and constructing arguments for a claimant. *Hensley v. Kijakazi*, 3:21-cv-00178, 2021 WL 5871542, at *13–14 (S.D. W. Va. Nov. 23, 2021), *adopted*, 2021 WL 5867126, at *1 (Dec. 10, 2021). Much like Claimant's brief in the instant matter, the *Hensley* claimant's brief merely listed

pieces of medical evidence, followed by an unadorned citation to the legal standard. Hensley did not articulate how the legal standard applied to her case, and—further—did not identify, specify, or indicate any deficiencies or gaps in the record; any further evidence necessary for the ALJ to develop; or how any of the evidence prompted further investigation or any further inquiries that the ALJ should have made. *See id.* Based upon these fundamental deficiencies, this Court found in *Hensley* that the claimant's "conclusory assertion that the ALJ failed to develop the record" did not assert a viable challenge to the Commissioner's decision. *See id.* Just as in *Hensley*, Claimant's conclusory statement in the matter *sub judice* that the ALJ failed in some unspecified way to develop the record does not identify any error warranting remand. (Pl.'s Br. at 11-13). Because Claimant's first allegation of error shares the same fundamental deficiencies presented in *Hensley*, he has plainly failed to assert a viable challenge to the Commissioner's decision and his request for relief should be denied on this basis alone.

Regardless of these inadequacies, Claimant's challenge to the ALJ's decision also fails on the merits, as the undersigned **FINDS** that the ALJ's thorough analysis in her written decision is well-supported by substantial evidence, and builds the requisite "accurate and logical bridge from the evidence to her conclusions." *Arakas v. Comm'r of Soc. Sec.*, 983 F.3d 83, 95 (4th Cir. 2020). First, the conditions and symptoms listed by Claimant were addressed in the ALJ's written decision. The ALJ fully considered Claimant's subjective complaints of pain and reported symptoms; she discussed at length Claimant's testimony regarding his back and leg pain, leg swelling, and syncope, difficulty with ambulation, standing or walking extended periods, lifting more than a gallon of milk, personal care, and household chores. (Tr. 17-18). Additionally, she expressly considered Claimant's testimony and allegations of his mental-health conditions, fully discussing

them at step two of the sequential process and explaining her reasoning for determining that these conditions were non-severe based upon Claimant's treatment with medication. (Tr. 17-18). Further, the ALJ thoroughly discussed the basis for her conclusion that Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 18). *See Johnson*, 434 F.3d at 653 (explaining that an ALJ's RFC finding must be limited solely to those limitations that are supported by the record).

Claimant's mere disagreement with the ALJ's conclusions is simply insufficient to establish error—particularly when the ALJ spent the remainder of the decision supporting this conclusion with the record evidence and explaining her conclusion that Claimant could perform a reduced range of light work. (Tr. 18-21). First, the ALJ considered the relevant evidence of Claimant's musculoskeletal impairments, discussing Claimant's negative lumbar spine x-ray in 2020 and occasional displays of reduced sensation and ambulation with a cane in 2021. (Tr. 18; see, e.g., 1179, 1761). She also discussed at length Claimant's consultative examinations from December 2020 and February 2022, pointing to medical records showing poor effort during muscle testing, steady ambulation with a limp on the right, and ability to walk in tandem, on tip toes, and on heels. (Tr. 18, 1181-85, 1832-35).

Next, the ALJ carefully considered Claimant's syncope issues stemming from cardiovascular and sleep impairments. (Tr. 19-21). For example, she considered Claimant's diagnosis for obstructive sleep apnea, which was corrected with a CPAP machine, and his negative electroencephalogram ("EEG"). (Tr. 19, 744-46, 748). She discussed Claimant's July 2020 heart surgery at length, pointing to medical records which showed an improvement in Claimant's symptoms as well as his echocardiogram and

implantation with a pacemaker. (Tr. 19, 1060- 61, 1200-01). The ALJ discussed Claimant's reports of continued syncope spells in the medical records, noting they were not witnessed by any medical professionals, testing was negative, and no instances were reflected in the pacemaker report. (Tr. 19; see, e.g., Tr. 1535, 1679-84).

Following the ALJ's careful consideration of Claimant's subjective allegations and the relevant medical evidence, the ALJ tied the evidence to her overall conclusions with an explanation of the logical basis for those conclusions. The ALJ explained that Claimant's allegations were not fully consistent with the record evidence, referencing Claimant's normal ejection fraction and that his edema improved following his July 2020 heart surgery. (Tr. 19). Regarding his allegations of syncope, the ALJ explained that these events could not be reproduced or reflected in any testing, and that Claimant was suggested to follow up with a syncope clinic consultation in November 2021 but did not do so. (Tr. 19). Further, the ALJ explained why she included limitations to pushing, pulling, reaching, and handling with Claimant's left upper extremity in her RFC determination, noting that despite giving poor effort in his consultative examination, he had reduced strength deficits in his upper-left side. (Tr. 19-20). Finally, the ALJ explained that she included a limitation to cane use in the RFC due to Claimant's occasional findings of decreased sensation in his legs and feet. (Tr. 20).

Next, the ALJ discussed the prior decision from January 2019. When adjudicating a disability claim that involves a prior ALJ decision, the adjudicator must consider the prior findings and give them appropriate weight in light of all relevant facts and circumstances. *See Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 474–75 (4th Cir. 1999). In accordance with the regulatory factors for an adjudicator to consider in determining the weight to be given to prior findings, *see* SSAR 00-1(4), 2000 WL 43774,

at *4 (Jan. 12, 2000), the ALJ noted that at the time of the prior decision, Claimant had severe impairments of degenerative disc disease, degenerative joint disease, status-post cervical fusion, chronic bronchitis and depressive disorder (Tr. 20, 67-76). She also noted that Claimant could perform a range of light exertion work (Tr. 20, 67-76). The ALJ properly explained why she deviated from these prior findings, explaining that "additional or greater limitation[s] [were] evidenced by subsequent records showing that [Plaintiff] has coronary artery disease and he has new complaints of syncope," meriting the addition of further environmental limitations and the use of a cane (Tr. 20). However, the ALJ explained that the prior finding that Claimant had severe mental impairments was afforded little weight, as although he showed some abnormalities in his psychological consultative examinations, he "received minimal conservative treatment with no abnormal findings reported by the claimant's treating physicians who saw the claimant frequently." (Tr. 20).

The ALJ then discussed the prior administrative medical findings and adopted many of their limitations in her RFC finding. The ALJ found the prior findings from medical experts Drs. Amigo and Wirts that Claimant could perform a range of light work persuasive, explaining that they supported their conclusions with internal notations regarding Claimant's physical functioning. *Id.* However, the ALJ determined those findings were only partially consistent with the overall record that supported Claimant's cane use—and she explained the evidentiary and logical basis for this determination. (Tr. 20, 107-09, 122-23). She engaged in a similar analysis with respect to Claimant's mental-health impairments. For instance, the ALJ explained why she found persuasive the findings by the State-agency psychological experts, Drs. Todd and Boggess, that Claimant did not suffer from severe mental impairments. She noted that these findings were

supported by their discussion of Claimant's mild social deficits and consistently unremarkable display of symptoms on examination, and that they were consistent with Claimant's minimal mental-health treatment and normal findings within the record (Tr. 20, 107-09, 122-23).

Similarly, the ALJ explained the evidentiary and logical basis for her finding that the opinion of Dr. Webb was unpersuasive—namely, that Dr. Webb's own notations in the medical records as well as other record evidence conflicted with her findings that Claimant was limited to performance of less-than-sedentary work. (Tr. 21, 941). In particular, there was "no evidence [Claimant] requires the ability to alternate positions two to three times a day." (Tr. 21). Further, the ALJ found no evidence that Claimant had any deficits in his right-upper-and-lower extremities, or evidence of any difficulties with fine manipulation—while there was record evidence indicating that Claimant had no-more-than-mild strength deficits, some limping but otherwise stable gait, and only trace edema. (Tr. 21).

After extensive discussion and consideration of the entire record, the ALJ determined that Claimant could perform work within the confines of the ALJ's comprehensive RFC assessment, and that Claimant remained capable of performing his past relevant sedentary work—the least-demanding physical work under the Social-Security Administration's regulations. (Tr. 21). The ALJ's ample discussion of the relevant evidence and explanation of how this evidence supported her conclusion that Claimant could perform his past relevant sedentary work easily clears the "not high" bar for substantial evidence. *See Biestek*, 139 S. Ct. at 1154; *Ladda v. Berryhill*, 749 F. App'x 166, 173 (4th Cir. 2018) (remanding for further function-by-function not required where the

ALJ "sufficiently explain[s] his conclusions" and "use[s] evidence from the record to explain" the RFC finding).

In response to the ALJ's thorough analysis, Claimant lists various diagnoses to imply that further limitations were warranted. (Pl.'s Br. at 13). However, his citation to mere diagnoses is insufficient to warrant remand. Rather, "[t]here must be a showing of related functional loss." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Claimant simply has not shown how these diagnoses caused any particular functional loss. Furthermore, the ALJ fully recognized Claimant's allegations and diagnoses in her discussion of Claimant's severe impairments (Tr. 13-16), her discussion of whether Claimant met a listing (Tr. 16-17), and in her RFC analysis (Tr. 17-21). The ALJ fully considered the evidence Claimant cites, and to the extent the ALJ did not discuss every allegation of Claimant or every medical note in the record, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in h[er] decision." *See Reid v. Comm'r of Soc. Sec. Admin.*, 769 F.3d 861, 865 (4th Cir. 2014).

While Claimant may feel that further development of the record was required, there is nothing to support this personal belief. At the hearing before the ALJ on December 12, 2022, the ALJ specifically asked Claimant's counsel directly if he "[knew] of any additional evidence that need[ed] to be submitted." (Tr. 42). Counsel responded on the record that there was none. (Tr. 42). Now before this Court, Claimant has failed to point to any record evidence indicating that follow-up was necessary; did not specify or reference any additional records which were outstanding; and did not point to any records not considered by the ALJ. In contrast, the ALJ's written decision is supported by a record comprised of nearly 1600 pages of medical evidence, including copious treatment records and a prior ALJ decision. Claimant's vague assertion the ALJ erred by not developing the

record is so plainly lacking in merit pursuant to well-established Fourth-Circuit jurisprudence that, quite frankly, it borders upon frivolousness under the circumstances.

In summary, as Claimant's undeveloped argument fails to provide any evidence or argument that further limitations were needed or that further record development was required, and the ALJ's accurate and logical bridge between the evidence and her determination shows that substantial evidence supports her conclusions, the final decision of the Commissioner must be affirmed.

## B. Combination of Impairments

Turning to Claimant's second and final assertion of error, Claimant contends that the combined effect of his medical conditions—degenerative disc disease of the cervical, lumbar and thoracic spine, coronary artery disease, chronic obstructive pulmonary disease, obstructive sleep apnea, obesity, degenerative joint disease, status post cervical fusion, chronic bronchitis, and anxiety and depressive disorder—when considered as a whole are sufficiently severe to meet a recognized disability Listing, even if they fall short individually. (ECF No. 12 at 16-17 (citing 42 U.S.C. § 423(d)(2); *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989)). The Listings to which Claimant refers are a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe that they would be disabled regardless of their vocational background. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).

To meet or medically equal a listing, a claimant bears the burden to prove that he "meet[s] *all* of the specified medical criteria," meaning that meeting only some of the criteria of a listing—no matter how severely—does not qualify. *Id.* at 530 (emphasis in original). *See also* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Bowen*, 482 U.S. at 146, n.5. The U.S. Supreme Court ruled in *Zebley* that a claimant cannot satisfy his or her burden by

showing that the *overall* or accumulated functional impact of his combination of impairments is as severe as that of a listed impairment. *Zebley*, 493 U.S. at 532 (citing SSR 83-19, 1983 WL 31248, at *3 (Jan. 1, 1983) ("[I]t is incorrect to consider whether the listing is equaled on the basis of an assessment of overall functional impairment."). Moreover, a conclusory statement that a combination of impairments medically equaled a listing is insufficient to satisfy a claimant's burden of proof. *See Byrd v. Apfel*, 98-cv-1781, 1998 WL 911718, at *4–5 (4th Cir. Dec. 31, 1998) (rejecting the appellant's argument that a combination of impairments that "come close" to meeting other listings medically equals a listing, and finding a conclusory statement that a combination of impairments medically equaled a listing was insufficient to satisfy claimant's burden).

In the matter *sub judice*, it is plainly evident that Claimant failed to carry his burden of proof. First and foremost, similar to the deficiency plaguing Claimant's first assertion of error, this argument is perfunctory and undeveloped. The totality of support for Claimant's position is contained in the following six vague, unsupported statements:

> The record in this case clearly establishes that the claimant has multiple severe medical and mental problems.

> Even a cursory review of the evidence of the record would conclude that the medical and mental problems, when combined, totally disable her [*sic*] and exceed the combination of impairments listing provided by the Social Security Regulations for disability.

> The overwhelming and uncontradicted competent medical evidence from multiple treating physicians confirms that the combined effect of the plaintiff's severe physical impairments render her [*sic*] unable to function in a substantial and gainful activity in any type of job.

> The claimant respectfully submits that the combined effects of his impairments were not properly considered and evaluated by the ALJ.

> The ALJ failed to consider the medical records of longtime treating physicians.

33

> The ALJ substituted her own opinion for those of the claimants treating physicians.

(ECF No. 12 at 17-18). Based upon these unsupported assertions, Claimant makes the conclusory statement that the ALJ's written decision "is contrary to the clear medical evidence" and thus "should be remanded for a more complete consideration and analysis of Claimant's full and complete medical evidence." (ECF No. 12 at 18). In other words, Claimant offers no evidence or explanation to support his position beyond a general statement of error. This is patently improper. As this Court explained in a previous decision, a mere conclusory assertion by a claimant that her multiple impairments "when combined, totally disable her and exceed the combination of impairments listing" is simply insufficient to demonstrate error. *Hensley*, 2021 WL 5871542, at *16. Raising such a challenge "only in a conclusory fashion . . . fails to assert a specific challenge to the Commissioner's decision," rendering the challenge "effectively waived." *Id. See also Adkins v. Colvin*, 3:14–27920, 2016 WL 854106, at *9 (S.D. W. Va. Feb. 11, 2016) (rejecting a claimant's similar argument when he failed to identify the listing he allegedly met in combination), *adopted*, 2016 WL 868342, at *1 (S.D. W. Va. Mar. 4, 2016).

In essence, Claimant is asking this Court to step into the shoes of an advocate, and find evidentiary support for his contentions. This is patently improper. *See Haperin*, 855 F. App'x 121 n.8. *See also Duckworth*, 2017 WL 1528757, at *5 ("It is well-established that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); *Heather M. v. Berryhill*, 384 F. Supp. 3d 928, 934 ("Judges are not required to sift through the record without direction from counsel— especially a thousand-page record—and find evidentiary support for contentions tossed out like salt strewn on an icy sidewalk[.]).

Even aside from the issue of waiver, Claimant nonetheless completely failed to meet his burden of proof. It is well-established that simply noting a claimant's various diagnoses is insufficient to demonstrate that he met or medically equaled a Listing based on his combination of impairments. *See* 20 C.F.R. § 404.1525(d) ("Your impairment(s) cannot meet the criteria of a listing based only on a diagnosis."); *Byrd*, 1998 WL 911718, at *4 ("It is not enough that the impairment have the diagnosis of a listed impairment; it must also have the findings shown in the listing of that impairment."); *Raines v. Kijakazi*, No. 3:21-CV-0045, 2021 WL 4258733, at *12 (S.D. W. Va. Aug. 27, 2021), *adopted* 2021 WL 4255625, at *1 (Sept. 17, 2021) (rejecting similar argument when the claimant failed to identify either the evidence the ALJ purportedly failed to "flesh out" in evaluating the claimant's impairments in combination, or the evidence which supports the claimant's position).

In fact, the six statements Claimant directs to this assertion of error are so vague, conclusory, and devoid of support by any record evidence, argument, or explanation, that Claimant's assertion of error once again encroaches into the realm of frivolousness. Claimant makes no effort to identify, specify, or explain the "more complete consideration and analysis" he seeks; the evidence he claims was "not properly considered and evaluated by the ALJ;" the "longtime treating physicians" to whom he vaguely alludes; the "medical records" not considered by the ALJ; or the manner in which the ALJ purportedly "substituted her own opinion for those of the Claimant's treating physicians." *Id*. at 17-18. Despite his claims that "a cursory review of the evidence of the record" shows that the ALJ's decision is "erroneous and contrary to the clear medical evidence," Claimant failed to point to *any* evidence in support of his conclusory assertion that his various diagnoses met or equaled a listing—or even to identify which listing he believes his combination of

impairments meets or medically equals. (*See* ECF No. 12 at 16-17). In short, while it is Claimant's burden to demonstrate that a Listing was met or medically equaled, he failed to identify *any* evidence that would meet the requisite criteria. (*See* ECF No. 12 at 16-17).

Moreover, contrary to Claimant's assertion of error, the ALJ *did* consider the combined effects of the Claimant's impairments. First, the ALJ expressly stated in her decision that the Claimant "does not have an impairment *or combination of impairments* that meets or medically equals the severity of one of the listed impairments," and that her RFC finding was determined pursuant to "careful consideration of the entire record[.]" (Tr. 16-17). As the Fourth Circuit has explained, "absent evidence to the contrary," where an ALJ states that she has carefully considered the entire record, a reviewing court should "take her at her word." *Reid*, 769 F.3d at 865.

Finally, the ALJ expressly addressed the relevant listings in her written decision. (Tr. 16-17). She properly evaluated Claimant's musculoskeletal issues under Listing 1.15 and Listing 1.16, his chronic obstructive pulmonary disorder and sleep apnea under Listing 3.02, and his cardiovascular impairments under Listing 4.04 and Listing 4.05. (Tr. 16). Further, the ALJ evaluated Claimant's obesity condition through its effects on other body systems in accordance with the applicable regulations, as obesity does not have corresponding Listings. (Tr. 16-17). Impairments in combination are properly considered where—as in the matter *sub judice*—the ALJ discusses each impairment separately and finds that the claimant's impairments, when considered together, did not prevent him from performing work activity. *See, e.g., Hundley v. Kijakazi*, 3:21-cv-00568, 2022 WL 1197031, at *13 (S.D. W. Va. Mar. 31, 2022), *adopted*, 2022 WL 1196983, at *1 (Apr. 21, 2022); *Wiseman v. Colvin*, 3:14–cv–28750, 2015 WL 9075457, at *19 (S.D. W. Va. Nov. 24, 2015), *adopted*, 2015 WL 9008899, at *1 (Dec. 15, 2015). *See also Adkins*, 2016 WL

854106, at *9 (finding substantial evidence supported the ALJ's decision where the ALJ considered the claimant's impairments in the listings analysis and in rendering the RFC).

In short, there is simply no indication that the ALJ failed to assess the totality of Claimant's impairments against the record evidence. *See Blankenship*, 2012 WL 259952, at *12 (concluding that ALJ properly considered impairments in combination where he "posed detailed hypothetical questions to the [VE] that indisputably included a generous representation of [claimant's] functional limitations"); *Parker v. Astrue*, No. 6:07-cv-00472, 2008 WL 2405026, at *2 (S.D.W. Va. June 11, 2008) (determining that ALJ properly considered impairments in combination where he "performed a comprehensive [RFC] evaluation" and assessed claimant's credibility by "analyz[ing] activities of daily living, medications and side effects, and [claimant's] alleged mental and physical limitations"). The ALJ in this case did exactly as required regarding consideration of all Claimant's impairments in combination at step three, and her decision is supported by substantial evidence; further, Claimant failed to demonstrate any error. Accordingly, the final decision of the Commissioner must be affirmed.

### *IV.    CONCLUSION*

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 12), **GRANT** the Commissioner's request to affirm his decision (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's active docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and

Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTERED:   August 20, 2024

Dwane L. Tinsley
United States Magistrate Judge